# In the United States Court of Federal Claims

No. 16-1664V

(Filed Under Seal: February 28, 2019 | Reissued: March 18, 2019)[*]

| | |
|---|---|
| KELLI TENNESON, | Keywords: Motion for Review; Vaccine Act; Contemporaneous Medical Records; Shoulder Injury Related to Vaccine Administration (SIRVA) |
| Petitioner, | |
| v. | |
| SECRETARY OF HEALTH AND HUMAN SERVICES, | |
| Respondent. | |

*Ronald C. Homer* and *Meredith Daniels*, Conway Homer, P.C., Boston, MA, for Petitioner.

*Daniel A. Principato*, Trial Attorney, Torts Branch, Civil Division, U.S. Department of Justice, Washington, DC, with whom were *Alexis B. Babcock*, Assistant Director, *Catharine E. Reeves*, Deputy Director, *C. Salvatore D'Alessio*, Acting Director, and *Joseph H. Hunt*, Assistant Attorney General, for Respondent.

## OPINION AND ORDER

**KAPLAN, Judge.**

The Secretary of Health and Human Services ("the HHS Secretary" or "the Secretary") seeks review of the ruling of Chief Special Master Nora B. Dorsey finding Petitioner Kelli Tenneson entitled to compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. §§ 300aa-10 et seq. ("the Vaccine Act"). Specifically, the Secretary challenges as arbitrary, capricious, and contrary to law the Chief Special Master's factual finding that Ms. Tenneson suffered a shoulder injury within forty-eight hours of receiving a flu vaccination.

For the reasons that follow, the Court finds the Secretary's arguments unpersuasive. The Secretary's motion for review is therefore **DENIED**.

---

[*] This opinion was previously issued under seal on February 28, 2019. The parties were given the opportunity to propose redactions on or before March 14, 2019. Because the parties have not filed proposed redactions, the Court reissues its decision in its entirety.

## BACKGROUND

### I.       The Evidence Before the Chief Special Master

On October 6, 2015, Kelli Tenneson, who was then fifty-eight years old, received an intramuscular flu vaccination from her primary care provider, Kaiser Permanente-Colorado. Pet'r's Ex. 1, at 1, ECF No. 7-2. According to an affidavit she executed in connection with this litigation, the vaccination was administered "very high up on [her] left arm, almost at [her] shoulder." Pet'r's Ex. 6, ¶ 2, ECF No. 8-1.

Ms. Tenneson asserts that the day after she received the vaccination, she woke up with extreme pain in her shoulder, which "started in the exact area where the shot was given." Id. ¶ 3. By the end of that evening, she states, she experienced "sharp pains all the way down [her] left arm." Id.

Although she alleges that she continued to experience shoulder pain in the months that followed, Ms. Tenneson did not seek medical care for her shoulder until January 2016 and did not actually see a physician for the injury until the end of March 2016. Id. ¶¶ 4–6. The central issue raised by the Secretary's request for review is whether, in light of that delay, it was arbitrary, capricious, and contrary to law for the Chief Special Master to credit Ms. Tenneson's testimony that her shoulder injury manifested itself within forty-eight hours of her October 6, 2015 vaccination.

 Ms. Tenneson explained in her affidavit that she decided to "wait it out" rather than seeking medical care immediately because she is "not one who easily goes to the doctor" and because she "had never heard of a flu vaccine causing this type of sustained pain." Id. ¶¶ 3–4. Ms. Tenneson's husband, Michael Tenneson, as well as her son, Josh, provided supporting affidavits concerning the effects of the vaccination. Pet'r's Ex. 8, 9, ECF Nos. 8-3, 8-4. Michael Tenneson stated that his wife had complained of severe pain the day after she received her flu shot and that she "could not lift her left arm above her shoulder without being in pain." Pet'r's Ex. 8, ¶ 1. According to Mr. Tenneson, in the days and months that followed, "the pain in her left upper arm still remained without any mobility above the shoulder." Id. ¶ 2. He stated that "on numerous occasions while lying in bed at night, I heard her moan while she moved around in bed, trying to find a comfortable position to somewhat alleviate her pain." Id. "On several occasions," according to Mr. Tenneson, Ms. Tenneson's pain kept them both awake. Id.

Similarly, Josh Tenneson testified by affidavit that, beginning in late October 2015, he noticed that his mother, who babysat his infant daughter four days a week, was for the first time having difficulties lifting things above her head and lifting the baby. Pet'r's Ex. 9, ¶¶ 1–2. He further testified that when he asked his mother if something was wrong, "she mentioned that she had been unable to lift her arm above her head since the vaccination" but that "[n]either of us thought much of it at the time and assumed the symptoms would dissipate." Id.

On December 17, 2015, Ms. Tenneson called Kaiser to request a letter of good health. Pet'r's Ex. 14, ¶ 2, ECF No. 21-1. The letter, which state law requires all employees of preschools to submit to their employer, is a one-page document affirming that the employee had been examined within the past year, that she had no communicable diseases, and that she was

able to work with children. Id. ¶¶ 2–3; see also Pet'r's Ex. 2, at 78, ECF No. 7-3 (call record reflecting a request by Ms. Tenneson for a "letter stating she has been seen within the last year and is in good health"). According to Ms. Tenneson, her primary care physician signed the form based on the prior year's physical exam, which had taken place several months before she received the influenza vaccination. Pet'r's Ex. 14, ¶ 4.

Ms. Tenneson's sister-in-law testified by affidavit that as the family gathered for Christmas in 2015 she was "very surprised to see that not only was [Ms. Tenneson's] arm not any better, but it actually seemed to be worse." Pet'r's Ex. 11, ¶ 4, ECF No. 10-2. Ms. Tenneson nonetheless "continued to tough it out" until January 2016, when she scheduled a March 30 appointment to see her primary care doctor about the shoulder pain. Pet'r's Ex. 14, ¶ 5; see also Ruling on Entitlement ("CSM Dec.") at 4, ECF No. 31.

In the meantime, on the morning of January 22, 2016, Ms. Tenneson called Kaiser complaining of blood in her urine and pressure "in [her] lower extremities," which she had been experiencing for the preceding two days. Pet'r's Ex. 14, ¶ 6; Pet'r's Ex. 2, at 80. The nurse who took her call listed her "chief complaint" as a "UTI" (urinary tract infection). Pet'r's Ex. 2, at 80.

Later that day, Ms. Tenneson and her family left for a trip to the mountains. While traveling, Ms. Tenneson asserts, she experienced "excruciating low back pain." Pet'r's Ex. 14, ¶ 6. After the family arrived at their destination, Ms. Tenneson reported to an emergency room at Middle Park Medical Center, which she characterizes as a "small mountain hospital" in a "small ski town in Colorado." Id. ¶ 7. Hospital records indicate that she complained of severe right flank/abdominal pain, low back pain, blood in her urine, discomfort with urination, nausea, and vomiting. Pet'r's Ex. 3, at 1, ECF No. 7-4.

The physical exam section of the emergency room report includes a heading entitled "extremities." The following terms were checked off: "non-tender," "nrml ROM [range of motion]," and "no pedal edema." Id. at 2.

Ms. Tenneson asserts that she remained at the emergency room for several hours but "only saw the doctor for approximately 2–3 minutes." Pet'r's Ex. 14, ¶ 7. She also states that although her shoulder was painful during the visit, her abdominal pain was worse. Id. ¶ 8.

Ms. Tenneson was diagnosed with a kidney stone. Id. Despite the notations in the extremities section of the emergency room report, Ms. Tenneson testifies that she "was never given an exam of [her] upper extremities, and specifically, [her] left shoulder was never tested for tenderness or range of motion." Id. ¶ 9. Furthermore, she states that when she was preparing to undergo a CT scan, she informed the technician that she had been unable to raise her hands above her head after having received a flu shot several months prior. Id. ¶ 10. This alleged comment is not reflected in the accompanying records. Ms. Tenneson's husband and son, who were with her during her visit to the emergency room, submitted supplemental affidavits that are generally consistent with Ms. Tenneson's recollection. See generally Pet'r's Ex. 15, 16, ECF Nos. 21-2, 21-3.

After she was released from the emergency room, Ms. Tenneson had two follow-up phone calls with Kaiser. The first was with a nurse on January 25, and the second was with her

primary care physician, Dr. Deja Vandeloo, on January 26. Pet'r's Ex. 2, at 84–85. In a summary of these calls, Dr. Vandeloo noted that pain medication was not then-needed because Ms. Tenneson was feeling better and that the kidney stone should pass within two weeks. Id. at 85. There is no mention of shoulder pain complaints in the call summaries.

On March 30, 2016, Ms. Tenneson kept the appointment that she had made in January to address her shoulder pain. Id. at 86. Medical records documenting the visit contain the notation "left arm pain since flu shot 10/15, pain all the way down arm. Can barely move arm now. Just hasn't gotten better. Wake her up at night. Does watch her grand-baby and can lift her but hard time getting seatbelt, etc." Id. at 89. Dr. Vandeloo conducted a musculoskeletal evaluation which confirmed Ms. Tenneson's complaints. She found "limited ROM left shoulder—can only abduct/extend to approx 80-90 degrees and can only get a few more degrees passively." Id. at 90.

Dr. Vandeloo diagnosed Ms. Tenneson with adhesive capsulitis of the left shoulder. Id. at 91. She advised Ms. Tenneson to take over-the-counter pain medications and perform a series of stretching exercises. Id. Ms. Tenneson was also given a referral for physical therapy and an orthopedist. Id. Dr. Vandeloo's referral to the orthopedist noted "left shoulder problem: frozen shoulder—[patient] has had pain ever since flu shot 10/15 [with] no injury. Worsening ROM over last 5 months." Id. at 89.

Records summarizing the March visit indicate that Dr. Vandeloo discussed Ms. Tenneson's injury with "shot line," which the Court understands to be a telephone service that provides advice to health care workers about vaccines and their administration. Id. at 91; see also Pamela K. Strohfus, Sharon R. Brown & Paige Potratz, Effective and Sustainable Advice Line Promotes Safe Vaccine Practices, 14 Int'l J. of Evidence-Based Healthcare 130 (2016), https://scholarworks.boisestate.edu/nursing_facpubs/174/. According to Dr. Vandeloo's notes, she was advised by "shot line" that the injury was "not due to [the] vaccine but they can't comment on administration." Pet'r's Ex. 2, at 91. Dr. Vandeloo also apparently consulted with an orthopedist who "felt [it] unlikely [that] this is all related to flu shot" but who acknowledged that Ms. Tenneson "certainly could have developed a frozen shoulder if she hasn't moved it x 5 mo" since the flu vaccination. Id. at 91, 97.

Ms. Tenneson met with Robert L. Webers, a physical therapist, on April 13, 2016. Id. at 99. Mr. Webers noted that Ms. Tenneson "got flu shot in [] Oct 2015, [and] since then she has had pain." Id. During the appointment, Ms. Tenneson advised Mr. Webers that her sleep was "disturbed" and that her pain level was "6/10." Id. Mr. Webers opined that her symptoms were "consist[e]nt with Adhesive capsulitis." Id. at 100. He recommended that Ms. Tenneson continue treatment every ten days for four weeks to increase her range of motion. Id.

A few weeks later, on April 27, 2016, Ms. Tenneson was examined by Dr. Tracy Frombach, an orthopedist. Id. at 105. Dr. Frombach noted "5 months left shoulder pain since flu shot 10/15 . . . [v]ery limited [range of motion]" and "[m]ild degenerative changes [in her] left shoulder." Id. at 107–08. Dr. Frombach described Ms. Tenneson's conditions as "Adhesive capsulitis of the left shoulder shortly following a flu injection in October 2015" and "[l]eft rotator cuff syndrome." Id. at 110. During the visit, Ms. Tenneson received a left subacromial injection after which her "range of motion was pain free" but still limited. Id. Dr. Frombach

advised Ms. Tenneson to continue with physical therapy and to follow up in six weeks. Id. at 111.

According to Dr. Frombach, Ms. Tenneson's adhesive capsulitis was "almost completely resolved" by October 2016. Pet'r's Ex. 4, at 45, ECF No. 7-5. Ms. Tenneson continued physical therapy through at least March 2017. See Pet'r's Ex. 13, at 33, ECF No. 16-2.

## II.    The Vaccine Claim

On December 20, 2016, Ms. Tenneson filed a petition for compensation under the Vaccine Act. She alleged that the flu vaccination she had received on October 6, 2015 had caused a shoulder injury. Pet. for Vaccine Compensation at 1, ECF No. 1. Her case was assigned to the Chief Special Master the next day for evaluation by the Special Processing Unit. See ECF Nos. 4, 5.

On June 19, 2017, the HHS Secretary filed a Rule 4(c) report opposing Ms. Tenneson's claim. See generally Resp't's Rule 4(c) Report, ECF No. 18. The Secretary argued that Ms. Tenneson had not established that the onset of her symptoms occurred within forty-eight hours of her vaccination, which is the time period that the relevant medical literature establishes for most vaccine-related shoulder injuries. Id. at 5. To the contrary, according to the Secretary, the contemporaneous medical records indicated that her shoulder pain began some three to six months after the vaccination. Id.

In a July 26, 2017 scheduling order, the Chief Special Master observed that based on the record before her, it appeared that Ms. Tenneson's claim "generally meets the requirements for SIRVA [(shoulder injury related to vaccine administration)]." Scheduling Order at 1, ECF No. 19. She further noted that "petitioner's affidavit together with the records evidence onset within 48 hours of petitioner's vaccination." Id. The Chief Special Master further stated that she did not "believe this [was] a claim that should to go to hearing," but that it rather "should be resolved for a reasonable amount." Id. She further "encourage[d] [Ms. Tenneson] to make a reasonable demand upon [the Secretary]." Id.

In a status report filed on October 2, 2017 the Secretary stated his intent to oppose Ms. Tenneson's claim and conveyed his unwillingness to engage in settlement discussions. Status Report at 1, ECF No. 25. At a status conference held on October 18, 2017, the Chief Special Master gave Ms. Tenneson the option of requesting a fact hearing or a ruling on the record; Ms. Tenneson elected the latter. See Scheduling Order at 1, ECF No. 26. Counsel for the government did not object to having the case decided on the record, stating instead that "he would defer to petitioner on how to proceed" and indicating that he was "amenable" to disposition on the record without a hearing. Id.

The Chief Special Master gave the parties thirty days to file additional evidence. Id. at 2. In addition, the parties were advised that the record would include two medical journal articles that concern shoulder injuries caused by vaccinations. Id. at 1; see also S. Atanasoff, Shoulder injury related to vaccine administration (SIRVA), 28 Vaccine 8049 (2010) (entered into the record as Court Ex. I, ECF No. 26-1); Marko Bodor & Enoch Montalvo, Vaccination-related

shoulder dysfunction, 25 Vaccine 585 (2007) (entered into the record as Court Ex. II, ECF No. 26-2).

## III.    The Chief Special Master's Decision

On March 30, 2018, the Chief Special Master issued a decision holding that Ms. Tenneson was entitled to compensation under the Vaccine Act. CSM Dec. at 12. She found that "the affidavits submitted by and on behalf of petitioner and the medical records work in tandem to provide preponderant evidence that petitioner's shoulder pain began within 48 hours of her October 6, 2015 flu vaccination." Id. at 8. The Chief Special Master declined the government's invitation to infer that Ms. Tenneson's account of the onset of her injury was unreliable because she waited several months to seek medical treatment. Id. at 7. The Chief Special Master concluded that the delay in seeking treatment was more relevant to the severity of the shoulder injury than to the date it began. Id. She reasoned that "[p]etitioner's account is detailed, cogent and corroborates the statements she made to her health care providers." Id. "Moreover," the Chief Special Master observed, in her experience, "petitioner's affidavits and medical records together reflect a pattern of treatment consistent with and similar to many other SIRVA claims." Id.

The Chief Special Master applied, and found satisfied, the three-prong test for establishing causation set forth in Althen v. Sec'y of Health & Human Servs., 418 F.3d 1274, 1278 (Fed. Cir. 2005). The Chief Special Master took judicial notice of the fact that HHS added SIRVA to the Vaccine Injury Table for the influenza vaccine effective March 21, 2017, after Ms. Tenneson filed her claim. CSM Dec. at 9. Based on that designation, the Chief Special Master found that prong one of the Althen test—which requires preponderant evidence of a medical theory causally connecting the flu vaccine to SIRVA—was met. Id. at 9–10; see also Althen, 418 F.3d at 1278. The Chief Special Master further concluded that there was a logical sequence of cause and effect between the vaccination and Ms. Tenneson's shoulder injury (prong two of the Althen test) based on an application of the Qualifications and Aids to Interpretation ("QAI") for SIRVA codified at 42 U.S.C. § 100.3(c)(10). CSM Dec. at 10–11.[1] Finally, the Chief Special

---

[1] That provision states in pertinent part that:

A vaccine recipient shall be considered to have suffered SIRVA if such recipient manifests all of the following:

(i) No history of pain, inflammation or dysfunction of the affected shoulder prior to intramuscular vaccine administration that would explain the alleged signs, symptoms, examination findings, and/or diagnostic studies occurring after vaccine injection;

(ii) Pain occurs within the specified time-frame;

(iii) Pain and reduced range of motion are limited to the shoulder in which the intramuscular vaccine was administered; and

Master found that the third prong of the <u>Althen</u> test—requiring a proximate temporal relationship between the vaccine and injury—was satisfied based on her factual finding that the onset of Ms. Tenneson's SIRVA pain (the morning after she was vaccinated) fell within the two-day period that HHS recognizes as the relevant medically accepted timeframe for such onset. <u>Id.</u> at 12; <u>see also</u> <u>Althen</u>, 418 F.3d at 1278.

Having found Ms. Tenneson entitled to compensation, the Chief Special Master instructed the parties to confer to discuss damages. Damages Order at 1, ECF No. 32. After several months of discussion, the Secretary filed a proffer of award on November 16, 2018, recommending a lump-sum payment of $88,017.82. Proffer on Award of Compensation at 1, ECF No. 50. The Chief Special Master accepted the recommendation and issued an order awarding damages in that amount to Ms. Tenneson on November 19, 2018. <u>See</u> Dec. Awarding Damages at 2, ECF No. 51.

## IV.   The Government's Motion for Review

On December 18, 2018, the Secretary filed the present motion for review which requests that the Court reverse the Chief Special Master's ruling on entitlement. <u>See generally</u> Resp't's Mot. for Review ("Resp't's Mot."), ECF No. 52. The Secretary advances two interrelated arguments in support of his motion. First, he argues that the Chief Special Master's ruling contravenes 42 U.S.C. § 300aa-13(a)(1), which prohibits a special master from finding a petitioner entitled to compensation "based on the claims of a petitioner alone, unsubstantiated by medical records or by medical opinion." Second, he argues, the Chief Special Master's factual finding as to the onset date of Ms. Tenneson's shoulder injuries was arbitrary and capricious because the Chief Special Master credited Ms. Tenneson's testimony, notwithstanding its alleged inconsistency with certain contemporaneous medical records (i.e., the notes concerning Ms. Tenneson's calls to her primary care physician in December 2015 and January 2016, and the record of her emergency room visit in January 2016).

For the reasons set forth below, the Court concludes that the Secretary's arguments lack merit. Accordingly, the motion for review is **DENIED** and the Chief Special Master's ruling on entitlement is **SUSTAINED**.[2]

## DISCUSSION

## I.   Jurisdiction

Congress established the National Vaccine Injury Compensation Program in 1986 to provide a no-fault compensation system for vaccine-related injuries and deaths. <u>Figueroa v.</u>

---

(iv) No other condition or abnormality is present that would explain the patient's symptoms (e.g. NCS/EMG or clinical evidence of radiculopathy, brachial neuritis, mononeuropathies, or any other neuropathy).

[2] The Court has determined that oral argument is unnecessary in this case. Accordingly, its decision is based on the record, the Chief Special Master's ruling on entitlement, and the parties' briefs.

Sec'y of Health & Human Servs., 715 F.3d 1314, 1316–17 (Fed. Cir. 2013). The Vaccine Act is remedial legislation that should be construed in a manner effectuating its underlying spirit and purpose. Id. at 1317.

To secure compensation under the Vaccine Act, a petitioner must prove by a preponderance of the evidence that the injury at issue was caused by a vaccine. See 42 U.S.C. §§ 300aa-11(c)(1), -13(a)(1)(A). Where a petitioner sustains an injury in association with a vaccine listed in the Vaccine Injury Table, causation is presumed. Broekelschen v. Sec'y of Health & Human Servs., 618 F.3d 1339, 1341–42 (Fed. Cir. 2010) (citing 42 U.S.C. § 300aa-11(c)(1)(C)(i); Andreu v. Sec'y of Health & Human Servs., 569 F.3d 1367, 1374 (Fed. Cir. 2009)). Where, as in this case, the injury is not listed in the Table, the petitioner must prove causation-in-fact. Broekelschen, 618 F.3d at 1342 (citing Moberly ex rel. Moberly v. Sec'y of Health & Human Servs., 592 F.3d 1315, 1321 (Fed. Cir. 2010)). To discharge that burden, "a petitioner must show that the vaccine was 'not only a but-for cause of the injury but also a substantial factor in bringing about the injury.'" Stone v. Sec'y of Health & Human Servs., 676 F.3d 1373, 1379 (Fed. Cir. 2012) (quoting Shyface v. Sec'y of Health & Human Servs., 165 F.3d 1344, 1352–53 (Fed. Cir. 1999)). "Once the petitioner has demonstrated causation, she is entitled to compensation unless the government can show by a preponderance of the evidence that the injury is due to factors unrelated to the vaccine." Broekelschen, 618 F.3d at 1342 (citing Doe v. Sec'y of Health & Human Servs., 601 F.3d 1349, 1351 (Fed. Cir. 2010); 42 U.S.C. § 300aa-13(a)(1)(B)).

A petition seeking compensation under the Vaccine Act is filed in the Court of Federal Claims, after which the Clerk of Court forwards it to the Chief Special Master for assignment to a special master. 42 U.S.C. § 300aa-11(a)(1). The special master to whom the petition is assigned "issue[s] a decision on such petition with respect to whether compensation is to be provided under the [Vaccine Act] Program and the amount of such compensation." Id. § 300aa-12(d)(3)(A). That decision is subject to review in the Court of Federal Claims and in the Court of Appeals for the Federal Circuit. Mahaffey v. Sec'y of Health & Human Servs., 368 F.3d 1378, 1383 (Fed. Cir. 2004) (citing 42 U.S.C. § 300aa-12(d)(3)(A)).

## II.    Standard of Review

The Vaccine Act grants the Court of Federal Claims jurisdiction to review the record of the proceedings before a special master, and authority, upon such review, to:

(A) uphold the findings of fact and conclusions of law of the special master and sustain the special master's decision,

(B) set aside any findings of fact or conclusion of law of the special master found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law and issue its own findings of fact and conclusions of law, or

(C) remand the petition to the special master for further action in accordance with the court's direction.

Id. § 300aa-12(e)(2); see also Vaccine Rule 27.

On review of the special master's decision, the Court applies the arbitrary and capricious standard to factual findings and the "not in accordance with law" standard to legal rulings. Moberly, 592 F.3d at 1321. "The arbitrary and capricious standard of review is difficult for an appellant to satisfy with respect to any issue, but particularly with respect to an issue that turns on the weighing of evidence by the trier of fact." Lampe v. Sec'y of Health & Human Servs., 219 F.3d 1357, 1360 (Fed. Cir. 2000). The Court "do[es] not reweigh the factual evidence, assess whether the special master correctly evaluated the evidence, or examine the probative value of the evidence or the credibility of the witnesses," because those "are all matters within the purview of the fact finder." Porter v. Sec'y of Health & Human Servs., 663 F.3d 1242, 1249 (Fed. Cir. 2011) (citing Broekelschen, 618 F.3d at 1349). "[A]s long as a special master's finding of fact is 'based on evidence in the record that [is] not wholly implausible,'" the Court must uphold it. Id. (quoting Cedillo v. Sec'y of Health & Human Servs., 617 F.3d 1328, 1338 (Fed. Cir. 2010) (alteration in original)). "[T]he standard of review is uniquely deferential" to special masters' decisions. Milik v. Sec'y of Health & Human Servs., 822 F.3d 1367, 1376 (Fed. Cir. 2016) (quoting Hodges v. Sec'y of Health & Human Servs., 9 F.3d 958, 961 (Fed. Cir. 1993)). "If the special master 'has considered the relevant evidence of record, drawn plausible inferences and articulated a rational basis for the decision,' then reversible error is 'extremely difficult to demonstrate.'" Id. (quoting Hines v. Sec'y of Health & Human Servs., 940 F.2d 1518, 1528 (Fed. Cir. 1991)).

## III.   The Secretary's Arguments

As noted above, the Secretary challenges the Chief Special Master's decision on two interrelated grounds. First, he argues that the Chief Special Master found that Ms. Tenneson's shoulder injury manifested itself within forty-eight hours of her vaccination based solely on her testimony and that of her family, and "unsubstantiated by medical records or medical opinions." Resp't's Mot. at 1–2 (citing 42 U.S.C. § 300aa-13(a)). This finding, according to the Secretary, contravened "the express terms of the Vaccine Act," specifically 42 U.S.C. § 300aa-13(b)(2). Id. at 8–9. Second, he argues that, in any event, the Chief Special Master's onset determination was arbitrary and capricious because: 1) she gave undue weight to Ms. Tenneson's affidavits, which he alleges were inconsistent with the contemporaneous medical records; and 2) she improperly relied upon her own personal experience (rather than record evidence) in determining the weight to be given to the records of Ms. Tenneson's emergency room visit. Id. at 14–17.

For the reasons set forth below, the Secretary's legal argument lacks merit. Further, the Secretary has failed to persuade the Court to second guess the Chief Special Master's factual finding regarding the onset date of Ms. Tenneson's shoulder injury. That finding must be upheld because it is based on reasonable inferences that the Chief Special Master drew from all of the evidence in the record, informed by her significant experience adjudicating similar cases under the Vaccine Program.

### A.   The Secretary's Argument That the Chief Special Master's Decision Violates 42 U.S.C. § 300aa-13(a)(1)

The Secretary's first argument, as noted above, is that the Chief Special Master's decision contravenes 42 U.S.C. § 300aa-13(a)(1). That provision states that a petitioner is entitled to compensation where the special master finds that she has demonstrated by

preponderant evidence "the matters required in the petition by section 300aa–11(c)(1) of [Title 42]" and "that there is not a preponderance of the evidence that the illness, disability, injury, condition, or death described in the petition is due to factors unrelated to the administration of the vaccine described in the petition." 42 U.S.C. § 300aa-13(a)(1)(A)–(B). The provision further states that "[t]he special master or court may not make such a finding based on the claims of a petitioner alone, unsubstantiated by medical records or by medical opinion." 42 U.S.C. § 300aa-13(a)(1). According to the Secretary, it is this prohibition that the Chief Special Master violated by allegedly relying entirely upon Ms. Tenneson's testimony (and that of her family members) to establish the onset date of her shoulder injury.

The Secretary's argument is flawed because it relies on a faulty premise—i.e., that the Chief Special Master's finding as to the onset date of Ms. Tenneson's shoulder injury was based entirely on affidavits that were "unsubstantiated by medical records or by medical opinion." In fact, the Chief Special Master did not rely exclusively on the affidavits to determine the onset date. She also cited the records of Ms. Tenneson's visit with Dr. Vandeloo on March 30, 2016, during which she reported that her shoulder pain had begun immediately after the October 2015 flu shot. CSM Dec. at 7. In addition, the Chief Special Master cited the records of Ms. Tenneson's physical therapy evaluation on April 13, 2016, which recount that "[patient] got a flu shot in Oct. 2015, and since then she has had pain." Id. Finally, the Chief Special Master relied upon the records of Ms. Tenneson's visit with the orthopedist on April 27, 2016, which stated that "the day following her flu shot she had significant pain in the left shoulder and had limited range of motion." Id.

To be sure, these medical records were not prepared contemporaneously with the event in question (i.e., the onset of Ms. Tenneson's shoulder injury). But Ms. Tenneson's delay in seeking treatment for her shoulder injury does not deprive the records of probative value as to the date Ms. Tenneson began experiencing shoulder pain and disability. Thus, the records are probative because they "contain information supplied to or by health professionals to facilitate diagnosis and treatment of medical conditions" and "[w]ith proper treatment hanging in the balance, accuracy has an extra premium." Cucuras v. Sec'y of Health & Human Servs., 993 F.2d 1525, 1528 (Fed. Cir. 1993). Given this presumption that an individual seeking treatment is likely to supply accurate information to their health care provider, the Court is unpersuaded by the Secretary's argument, which seems to assume—with no supporting evidence, direct or circumstantial—that Ms. Tenneson intentionally deceived her doctors regarding the onset date of her shoulder pain.

Finally, and in any event, it is not readily apparent that 42 U.S.C. § 300aa-13(a)(1) precludes a special master or court from finding an onset date supported by preponderant evidence based on lay testimony, as the Secretary contends. That provision's language states that an adjudicator cannot find that a petitioner has demonstrated by preponderant evidence "the matters required in the petition by section 300aa–11(c)(1) of [Title 42]" without substantiation by medical evidence or medical opinion. But 42 U.S.C. § 300aa-13(a)(1) does not speak to the circumstances under which particular subsidiary facts relevant to causation (such as, for example, the fact of a vaccination or the onset date of an injury) may be established by preponderant evidence on the basis of lay testimony, so long as the overall finding of causation is sustained by medical records or medical opinion. Centmehaiey v. Sec'y of Dep't of Health & Human Servs., 32 Fed. Cl. 612, 621, aff'd sub nom. Centmehaiey v. Sec'y of Health & Human

Servs., 73 F.3d 381 (Fed. Cir. 1995) (noting that 42 U.S.C. § 300aa−13(a)(1) does not bar recovery where there is no contemporaneous, documentary proof of a vaccination) (citing Brown v. Sec'y of Dep't of Health & Human Servs., 18 Cl. Ct. 834, 839 (1989), rev'd on other grounds, 920 F.2d 918 (1990)).

As the Court sees it, the prohibition in 42 U.S.C. § 300aa-13(a)(1) is against finding a cause-and-effect relationship between a vaccine and an injury without any substantiation by medical evidence or opinion. See Johnston v. Sec'y of Dep't of Health & Human Servs., 22 Cl. Ct. 75, 78 (1990) ("Section 300aa−13(a)(1) is a general admonition. It is an effort to weed out claims which have no medical basis to support the injury."); Camery v. Sec'y of Health & Human Servs., 42 Fed. Cl. 381, 389 (1998) (same). In any event, the Court has found that the onset date for Ms. Tenneson's shoulder injury was supported by medical records. It therefore need not decide whether it is always impermissible to rely on lay testimony to establish an onset date.

In short, there is no merit to the Secretary's argument that the Chief Special Master committed a legal error when she found that the onset date of Ms. Tenneson's shoulder injury was within forty-eight hours of her vaccination. The Court turns, therefore, to the Secretary's argument that the onset date finding—if not legally erroneous—was nonetheless arbitrary and capricious.

## B.   The Secretary's Argument That the Chief Special Master's Factual Determination Regarding the Date of Onset Was Arbitrary and Capricious

The Secretary's second argument is that the Chief Special Master's onset determination was arbitrary and capricious because she found Ms. Tenneson's testimony regarding the onset date of her symptoms credible, notwithstanding what the Secretary asserts was its inconsistency with contemporaneous medical records. Specifically, the Secretary takes the Chief Special Master to task for not giving greater weight to Ms. Tenneson's failure to seek treatment more promptly or to mention her shoulder condition when she called her physician's office in December 2015 and January 2016. He contends that these actions (or failures to act), undermine the credibility of Ms. Tenneson's testimony as to the onset date of her injury. Moreover, the Secretary argues, contemporaneous medical records (the records of Ms. Tenneson's January emergency room visit) affirmatively indicated a lack of tenderness in her extremities and a normal range of motion, results which are inconsistent with Ms. Tenneson's contention that she had been suffering significant shoulder pain since the preceding October.

As the Court explained above, however, its function on review of the decision of a special master is not to "reweigh the factual evidence, assess whether the special master correctly evaluated the evidence, or examine the probative value of the evidence or the credibility of the witnesses." Porter, 663 F.3d at 1249. In fact, the Court is required to uphold factual findings that are "based on evidence in the record that [is] not wholly implausible." Cedillo, 617 F.3d at 1338.

Here, the Chief Special Master provided an entirely reasonable explanation for crediting Ms. Tenneson's testimony (and that of her family) regarding the onset date of her shoulder injury, notwithstanding her delay in seeking treatment. She observed that Ms. Tenneson's medical records "repeatedly and consistently placed the onset of her condition within 48 hours of

her vaccination." CSM Dec. at 7. She found that "the fact that [Ms. Tenneson] delayed seeking treatment for her shoulder symptoms does not negate the value of her treatment records or render this evidence not credible, although it may speak to the severity of her injury." Id. She further found "reasonable and credible" Ms. Tenneson's affidavits explaining her "pattern of treatment and reports to her physicians" (which were consistent with those of her family members), and observed that in her (considerable) experience, "petitioner's affidavits and medical records together reflect a pattern of treatment consistent with and similar to many other SIRVA claims." Id.

Further, the Chief Special Master provided an adequate explanation for her decision not to give greater weight to the emergency room treatment records which reflected that checkmarks had been placed next to boxes for "non-tender," "nrml ROM," and "no pedal edema" under the "extremities" portion of the physical exam section. As the Chief Special Master explained, Ms. Tenneson "was seen at the ER on January 22, 2016 for a [urinary tract infection] and kidney stones which are extremely painful conditions for which petitioner was seeking urgent medical attention." Id. at 8. Ms. Tenneson's testimony was that her shoulders were not examined and that the doctor spent no more than two or three minutes with her. Id. at 4. And the Chief Special Master noted that, in her experience, "thorough physical examinations are not conducted in the ER setting for issues beyond or unrelated to the reason for that visit . . . in contrast to a general or physical examination conducted by a primary care physician or orthopedist." Id. at 8. Similarly, the Chief Special Master found that the calls on January 25 and 26 were "clearly in follow-up to petitioner's emergency room visit for her UTI and kidney stones, and the description of lack of pain relates accordingly to those issues." Id.

The Secretary contends that the Chief Special Master "erred by relying upon her own undisclosed (and effectively unrebuttable) opinion about the standard of care in emergency rooms based on her personal experience." Resp't's Mot. at 17. According to the Secretary, "the Chief Special Master's determination that no extremities exam was performed here . . . was purely speculative." Id. The Court finds this argument unpersuasive. The Chief Special Master did not speculate; she found credible Ms. Tenneson's testimony that—notwithstanding the checked boxes—her left shoulder was not examined during her visit. The Chief Special Master reasonably noted that a more thorough examination is often not conducted for issues beyond those for which the patient presents at an emergency room. After all, the purpose of an emergency room visit is to receive emergency treatment, not a comprehensive health check-up.

That the Chief Special Master is "not herself a medical doctor" and "has no direct knowledge of the particular medical facility in question" does not mean she cannot rely on her experience and common sense to evaluate evidence. See id. Indeed, a special master may rely upon her "accumulated expertise" gained adjudicating Vaccine Act claims. Hodges, 9 F.3d at 961. That includes her accumulated expertise reviewing a variety of medical reports and considering numerous medical procedures, including those produced and undertaken in the emergency room setting.

It was equally sensible for the Chief Special Master not to draw conclusions about the onset of Ms. Tenneson's shoulder injury from her contacts with one of the medical assistants at Kaiser in December, when she was seeking a "letter of good health" to enable her to work at a

preschool. The impetus for those contacts was limited to securing the required certification for employment purposes.

Finally, the Court gives no credence to the Secretary's claim that the Chief Special Master's decision resolved "a question of extraordinary importance to the Vaccine Injury Compensation Program" and that "if allowed to stand, the decision . . . would set a troubling precedent that petitioner can establish entitlement to compensation simply by averring an appropriate onset in an affidavit even where the contemporaneous medical records do not support these claims, and in fact affirmatively show a lack of symptoms." See Resp't's Mot. at 12. For one thing, to the extent that the Secretary wished to challenge the credibility of Ms. Tenneson's affidavit regarding the onset date (or the affidavits of her family members), he could have requested the opportunity to cross-examine her at a hearing. Instead, he agreed that the case could be decided on the record. Second, it is not true that Ms. Tenneson's claims as to onset have no support in the medical documentation. As described above, Ms. Tenneson's allegations in her affidavit regarding the onset date are consistent with what she told her physicians and medical professionals when she sought treatment for her injury. And finally, the Chief Special Master explained why, in the context of the facts of this case, she did not give weight to the perfunctory notations regarding Ms. Tenneson's "extremities" that were contained in the emergency room records.

In short, the Chief Special Master's decision was based on all of the evidence before her. She provided an adequate and reasonable explanation for her finding that Ms. Tenneson's shoulder injury manifested within forty-eight hours of the vaccination. The inferences she drew and the conclusions she reached were not unreasonable. The Court, accordingly, sustains her decision.

## CONCLUSION

On the basis of the foregoing, the Respondent's motion for review is **DENIED** and the Chief Special Master's ruling on entitlement is **SUSTAINED**. The Clerk is directed to enter judgment accordingly.

**IT IS SO ORDERED.**

s/ Elaine D. Kaplan
ELAINE D. KAPLAN
Judge